## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Docket No. 2:24-cr-00040-NT |
| | ) | |
| ALBERTO REBOLLAR OSORIO, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON DEFENDANT'S MOTION TO DISMISS

Before me is Defendant Alberto Rebollar Osorio's motion to dismiss the indictment charging the Defendant, an undocumented Mexican citizen living in Maine, with possession of a firearm as a prohibited person under 18 U.S.C. § 922(g)(5) (ECF No. 22). For the reasons that follow, I **GRANT** the motion to dismiss.

## BACKGROUND

On March 20, 2024, a federal grand jury charged Rebollar Osorio in a one-count indictment with a violation of a federal gun law that prohibits "any person . . . who, being an alien . . . is illegally or unlawfully in the United States" from possessing firearms. 18 U.S.C. § 922(g)(5) ("**Section 922(g)(5)**"); Indictment (ECF No. 16). Rebollar Osorio has moved to dismiss the indictment, arguing that Section 922(g)(5) is unconstitutional under the Second Amendment, both facially and as applied to him. Mot. to Dismiss Count One ("**Mot. to Dismiss**") (ECF No. 22). I held oral argument on the motion on July 25, 2024, and the parties later submitted supplemental briefing and exhibits (ECF Nos. 33–34).

## LEGAL STANDARDS

### I.      Federal Rule of Criminal Procedure 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Criminal Procedure permits a defendant to move to dismiss an indictment on constitutional grounds. Fed. R. Crim. P. 12(b)(1) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."). *See, e.g.*, *United States v. Carter*, 752 F.3d 8, 12 (1st Cir. 2014) (considering a motion to dismiss an indictment raising a constitutional challenge under 18 U.S.C. § 922(g)(9)). In reviewing a motion to dismiss in the criminal context, as in civil litigation, I accept the factual allegations in the indictment as true. *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Guerrier*, 669 F.3d 1, 4 (1st Cir. 2011). But in the criminal context, the Court's power to dismiss is reserved "for extremely limited circumstances" because dismissing an indictment "directly encroaches upon the fundamental role of the grand jury." *Whitehouse v. U.S. Dist. Ct. for Dist. of R.I.*, 53 F.3d 1349, 1360 (1st Cir. 1995) (internal citation omitted).

### II.     The Second Amendment and the *Bruen* Framework

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court moved away from the then-existing view that the Second Amendment bestowed a collective right to bear arms in support of a militia. 554 U.S. 570, 582–84 (2008). After conducting an extensive historical analysis, the Court decided instead that the

Second Amendment secured a preexisting individual right to bear arms. *Id.* at 577–619.

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court set forth a two-step process that courts should use to assess a claim that a statute interferes with the Second Amendment:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct ["**Step One**"]. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command" ["**Step Two**"].

597 U.S. 1, 17 (2022) (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

## DISCUSSION

In his motion to dismiss, Rebollar Osorio argues that Section 922(g)(5)'s complete ban on firearm possession covering "*all* undocumented aliens, in *all* places, for *all* purposes" violates the Second Amendment on its face and as applied to him. Mot. to Dismiss 4. Rebollar Osorio asserts that early firearm regulations focused on disarming dangerous individuals and that the Government cannot prove Rebollar Osorio poses any public safety risk such that he cannot be trusted with a firearm. Mot. to Dismiss 10–12.

Rebollar Osorio brought both facial and as-applied challenges to Section 922(g)(5), but at oral argument, counsel for Rebollar Osorio indicated that she was

only pressing the as-applied challenge. In considering an as-applied challenge, courts look to whether a law with some permissible use "is nonetheless unconstitutional as applied to [the defendant's] activity." *Spence v. Washington*, 418 U.S. 405, 414 (1974).

Before I apply the *Bruen* framework to Rebollar Osorio's case, I address the Government's argument that the Second Amendment does not apply to unlawful aliens, full stop.[1] *See* Gov't's Resp. in Opp'n to Def.'s Mot. to Dismiss ("**Gov't's Opp'n**") 4–8 (ECF No. 24).

## I.   Whether "The People" Covered by the Second Amendment Includes Unlawfully Present Aliens

The Government argues that Rebollar Osorio is outside the protections of the Second Amendment because, as a noncitizen unlawfully in the United States, he is not among "the people" protected by the Second Amendment. Gov't's Opp'n 4–8. The issue of whether a noncitizen is one of "the people" adds a dimension not addressed in *Bruen* or any other Supreme Court gun regulation case to date.[2]

---

[1]    The Defendant and the Government refer to people not lawfully present in the United States interchangeably as "undocumented aliens," "undocumented immigrants," "undocumented noncitizens," "unlawful noncitizens," "illegal immigrants," and "illegal aliens." The relevant statute refers to "alien[s] . . . illegally or unlawfully in the United States." 18 U.S.C. § 922(g)(5). While acknowledging that some might find these terms offensive, I use the phrase "unlawful alien" or "unlawfully present alien" in this order for clarity and consistency with the statute.

[2]    Some courts have referred to this question as "*Bruen* Step Zero" because they believe *Bruen* Step One permits them to consider only an individual's conduct and not his status. *See N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1, 17 (2022) ("[W]hen the Second Amendment's plain text covers . . . *conduct*, the Constitution presumptively protects that conduct.") (emphasis added). *See, e.g.*, *United States v. Kays*, 624 F. Supp. 3d 1262, 1265–66 (W.D. Okla. 2022); *id.* at 1265 n.4 ("[A]n individual's Second Amendment rights are not predicated on their classification, but rather, their conduct."). Other courts have decided that determining whether an individual is covered by the Second Amendment requires "looking to the historical scope of the Second Amendment right" as part of the Step One analysis. *United States v. Price*, 111 F.4th 392, 401 (4th Cir. 2024). *See, e.g.*, *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) ("*Bruen* step one involves a threshold inquiry" of "whether the challenger is part of 'the people' whom the Second Amendment protects, whether the weapon at issue is in common use today for self-defense, and whether the proposed course of conduct falls within the Second Amendment.") (internal citation and quotation marks omitted). At least one court has reasoned

The leading Supreme Court authority on the meaning of the term "the people" as used in the Bill of Rights is *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) (quoted in *Heller*, 554 U.S. at 583). In *Verdugo-Urquidez*, the Court considered whether the Fourth Amendment (which also refers to "the right of the people") extends to aliens when they are outside United States territory. *Id.* at 264–75. The Court recognized that " 'the people' seems to have been a term of art employed in select parts of the Constitution." *Id.* at 265. After discussing the various uses of "the people," the Court explained:

> While this textual exegesis is by no means conclusive, it suggests that "the people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community *or* who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id.* (emphasis added).

The *Heller* Court cited *Verdugo-Urquidez* but deviated from this "national community" and "sufficient connection" language  by saying that "in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the *political community*." *Heller*, 554 U.S. at 580 (emphasis

---

that in the Section 922(g)(5) context, "the step zero analysis and the step two analysis are functionally identical, collapsing into a single inquiry," because an unlawful alien "may be entirely excluded from the Second Amendment's protections . . . only if there is a historical basis" for doing so. *United States v. Sing-Ledezma*, 706 F. Supp. 3d 650, 659 (W.D. Tex. 2023) (citing *United States v. Daniels*, 77 F.4th 337, 342 (5th Cir. 2023), *cert. granted, judgment vacated*, 144 S. Ct. 2707 (2024)).

   Regardless of whether this inquiry is better considered as a threshold "Step Zero" question or as part of the *Bruen* Step One analysis, I agree that an individual's status is distinct from his conduct. The Supreme Court has observed that Section 922(g)(5) can be divided into both a conduct element and a status element. *Rehaif v. United States,* 588 U.S. 225, 227 (2019) ("We hold that the word 'knowingly' applies both to the defendant's conduct and to the defendant's status."). I thus address Rebollar Osorio's status and whether he is one of "the people" separately from his conduct.

added). As the Government points out, the Supreme Court has repeatedly referred to the Second Amendment right as belonging to "all Americans" and " 'citizens' who are 'law-abiding.' "[3] Gov't's Opp'n 5 (quoting *Heller*, 554 U.S. at 581, 625).

There are three problems with the Government's argument that the Second Amendment only applies to law-abiding citizens of the United States. The first is the plain meaning of the terms "the people" and "citizens." Second, the historical understanding of the term "the people" around the time of the founding supports a meaning broader than just "citizens." Third, the Government's argument that the Second Amendment only applies to citizens relies on dicta (albeit dicta from the Supreme Court).

## A.      The Plain Meaning of the Terms "the People" and "Citizens"

I begin with the plain meaning of the term "the people." The drafters of the Second Amendment used the phrase "the right of *the people*" instead of "the right of *United States citizens*." It is clear from a review of the Constitution and its amendments that the framers knew how to use both phrases. In addition to the Second Amendment, the term "the people" appears in the preamble, Article I, and four other amendments in the Bill of Rights. *See* U.S. Const. pmbl.; *id.* art. I, § 2; *id.*

---

[3]      The Government cites *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *Bruen*, 597 U.S. 1 (2022). The *Heller* Court, in addition to referencing the "political community," also: (1) chronicled founding era laws that guaranteed the right to bear arms to various groups of *citizens*, 554 U.S. at 580; (2) stated the Second Amendment "belongs to all *Americans*," *id.* at 581 (emphasis added); and (3) said the Second Amendment "elevates above all other interests the right of *law-abiding, responsible citizens* to use arms in defense of hearth and home," *id.* at 635 (emphasis added). In *Bruen*, the Court said that "[*Heller*] and [*McDonald*] . . . recognized that the Second and Fourteenth Amendments protect the right of an *ordinary, law abiding citizen* to possess a handgun in the home for self-defense." *Bruen*, 597 U.S. at 8–9 (emphasis added).

amends. I, IV, IX, & X. By contrast, "citizen" appears in the Constitution twenty-two times and "citizen of the United States" in several additional places.[4] The drafters had the word "citizen" available and could have used it had they intended the Second Amendment to apply only to United States citizens.

Further, both the Second and Fourth Amendments use the term "the right of the people," and both were ratified as part of the Bill of Rights in 1791. The term "the people" used in the Fourth Amendment extends to aliens who meet the *Verdugo-Urquidez* test of either belonging to the national community or having the requisite community ties. *See, e.g.*, *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) (holding a Mexican citizen in the United States had the Fourth Amendment right to be free of unreasonable searches and seizures); *United States v. Vilches-Navarrete*, 523 F.3d 1, 13–15 (1st Cir. 2008) (affirming the district court's dismissal of a Fourth Amendment claim by a Chilean defendant who failed to show "substantial connections" with the United States).[5] "[I]dentical words used in different parts of the

---

[4]    *See* U.S. Const. art. I, § 2 ("No Person shall be a Representative who shall not have . . . been seven Years a Citizen of the United States . . . ."); *id.* art. I, § 3 ("No Person shall be a Senator who shall not have . . . been nine Years a Citizen of the United States . . . ."); *id.* art. II, § 1 ("No Person except a natural born Citizen, or a Citizen of the United States . . . shall be eligible to the Office of President . . . ."); *id.* amends. XV, XIX, XXIV, & XXVI (stating that "the right of citizens of the United States" to vote "shall not be "denied or abridged" on account of "race, color, . . . previous condition of servitude," "sex," "failure to pay any poll tax or other tax," or "age").

[5]    It is also clear that aliens who reside in the United States, sometimes including unlawful aliens, enjoy other constitutional rights. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 211–12 (1982) (unlawful resident alien is a "person" under the Fourteenth Amendment's Equal Protection Clause); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953) (unlawful resident alien is a "person" under the Fifth Amendment); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (resident aliens have First Amendment rights); *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 489 (1931) ("alien friend" protected by the Fifth Amendment's Just Compensation Clause); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (resident aliens have Fifth and Sixth Amendment rights); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (resident alien is a "person" under the Fourteenth Amendment). *See also Vieira Garcia v.*

same [text] are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). Accordingly, it seems the *Verdugo-Urquidez* standard should apply to the Second Amendment, as the opinion's dicta indicates. *See Verdugo-Urquidez*, 494 U.S. at 265. This canon of construction is particularly pertinent here given that the Second and Fourth Amendments were written and adopted at the same time. *See Erlenbaugh v. United States*, 409 U.S. 239, 243–44 (1972) (explaining that the rule that "a legislative body generally uses a particular word with a consistent meaning in a given context . . . certainly makes the most sense when the statutes were enacted by the same legislative body at the same time").

**B.    The Historical Context of the Term "the People"**

To understand what the founders meant by the term "the people" and why they did not use the term "citizens," it is helpful to understand the historical context of these terms. William Blackstone, considered by the Supreme Court to be "the preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593–594 (internal citation and quotation marks omitted), has commented that in the English Declaration of Rights, the right of "having and using arms" belongs to "the subject." 1 William Blackstone, Commentaries on the Laws of England 139–40 (1765) (reprinted 1992); *Heller*, 554 U.S. at 594.

Blackstone's book on "the Rights of Persons" contains a chapter entitled "Of the People, Whether Aliens, Denizens, or Natives," which explains the respective

---

*I.N.S.*, 239 F.3d 409, 414 (1st Cir. 2001) ("There can be no doubt that aliens are entitled to equal protection of the law.").

statuses of the various categories of "the *people*." 1 Blackstone, Commentaries 354 (emphasis in original). The differences revolve around the concept of allegiance, which Blackstone describes as "a debt due from the subject, upon an implied contract with the prince, that so long as the one affords protection, so long the other will demean himself faithfully." *Id.* at 358.

As Blackstone explains it, "natives" are "[n]atural-born subjects" who are "born within the dominions of the crown of England," *id.* at 354, and have natural, perpetual, and universal allegiance to the king in return for the king's protection, *id.* at 358. By contrast, aliens are "stranger born." *Id.* Though aliens are also "subjects," *id.* at 354, they owe only "[l]ocal allegiance" to the king and only for so long as they "continue[ ] within the king's dominion and protection," *id.* at 358.[6] Blackstone explains that a "denizen" occupies a "middle state between an alien, and natural-born subject" in that they are "stranger born," *id.* at 358, but are in the process of becoming "an English subject," *id.* at 362.[7]

---

[6]    Blackstone clarifies that when discussing the rights of "aliens," he means "alien friends only, . . . whose countries are in peace with ours," reasoning that by contrast, "alien-enemies have no rights, no privileges, unless by the king's special favour, during the time of war." 1 William Blackstone, Commentaries on the Laws of England 360–61 (1765). Blackstone explains that "alien friends" owed local allegiance to, and received protection from, the king but enjoyed "much more circumscribed" rights than natural-born subjects. *Id.* at 358–60. Blackstone elaborates on the rights that aliens had, which included the right to "purchase lands, or other estates," but only for so long as the alien remained in the kingdom. *Id.* at 360. When the alien left, the lands reverted to the king. *Id.* Aliens also had the right to own and maintain "goods, money, and other personal estate" and to "trade as freely as other people." *Id.* In this discussion of the limits on alien rights, Blackstone says nothing about whether aliens had a right to possess firearms.

[7]    Blackstone explains that "[n]aturalization [could not] be performed but by act of parliament: for by this an alien [was] put in exactly the same state as if he had been born in the king's ligeance; except only that he is incapable, as well as a denizen, of being a member of the privy council, or parliament, &c." 1 Blackstone, Commentaries 362.

9

Picking up where Blackstone leaves off, James Kent's Commentaries discuss what happened after the American Revolution: "[B]y the treaty of peace of 1783, Great Britain and the United States became respectively entitled . . . to the allegiance of all persons who were at the time adhering to the governments respectively, and that those persons became aliens in respect to the government to which they did not adhere." 2 James Kent, Commentaries on American Law 60–61 (2d ed. 1832).

On the question before me—whether an alien is among "the people" referenced in the Second Amendment—the most important takeaway from Blackstone is that the term "the people" included aliens, denizens, and natives. Granted, an idea's acceptance in England does not necessarily mean it was accepted by the colonists, but these terms also appear in American legislation from 1798. For example, the Naturalization Act of 1798 provided that "no alien, who shall be a native, citizen, denizen or subject of any nation or state with whom the United States shall be at war" could become a United States citizen. Naturalization Act of 1798, Pub. L. No. 106-73, § 1, 1 Stat. 566 (1798) (repealed 1802). Collectively, these sources suggest that when the Second Amendment was drafted in 1791, the term "the people" likely meant something broader than just United States citizens.

### C. The Government's Cases Do Not Address the Breadth of the Term "The People" in The Context of the Second Amendment

As discussed above, the *Heller* Court cited *Verdugo-Urquidez* but deviated from its language by referring to a "political community." *Heller*, 554 U.S. at 580. *Heller*, and the other cases cited by the Government in which the Supreme Court repeatedly states that the Second Amendment belongs to "law-abiding citizens" and

10

"Americans," involved litigants who *were* law-abiding United States citizens. *See generally Heller*, 554 U.S. at 574 (involving a police officer challenging a District of Columbia law that banned handguns in the home); *McDonald v. City of Chicago*, 561 U.S. 742, 750, 850 n.19 (2010) (involving Chicago residents challenging a Chicago ordinance "effectively banning handgun possession by almost all private citizens who reside in the City"); *Bruen*, 597 U.S. at 15 (involving "law-abiding, adult citizens" challenging New York's "proper cause" licensing requirement for carrying concealed firearms). The Court therefore did not have occasion to address the issue raised here.

In the Supreme Court's most recent Second Amendment case, *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Court addressed a facial constitutional challenge to 18 U.S.C. § 922(g)(8), which prohibits a person under a domestic violence restraining order from possessing firearms. The Court did not reject Rahimi's challenge on the ground that he was not a law-abiding, "responsible" citizen who deserved Second Amendment protection, *id.* at 1903, even though the Court's summary of the facts made it clear that Rahimi was neither law-abiding nor responsible. 144 S. Ct. at 1894–95.[8] Instead, the Court followed the two-part *Bruen* analysis. *Id.* at 1898.

The *Rahimi* Court also expressly distanced itself from the term "responsible," explaining: "In *Heller* and *Bruen*, we used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. But those

---

[8]     In the opening paragraphs of *Rahimi*, the Court recounts how Rahimi assaulted two different women, dealt illegal drugs, shot at people he perceived had wronged him, and fired his gun "into the air" when annoyed. *United States v. Rahimi*, 144 S. Ct. 1889, 1894–95 (2024).

decisions did not define the term and said nothing about the status of citizens who were not 'responsible.' The question was simply not presented." *Rahimi*, 144 S. Ct. at 1903 (internal citations omitted). *Rahimi* suggests lower courts should conduct the *Bruen* analysis and should not assume the Second Amendment does not apply simply because someone is not law-abiding or responsible. Extending that reasoning, I infer that the Court also expects lower courts to conduct the *Bruen* analysis to determine whether the Second Amendment protects a noncitizen.

Like the Supreme Court, the First Circuit has not addressed whether the Second Amendment applies to noncitizens unlawfully present in the United States. Other circuits have split on the question of whether "the people" as used in the Second Amendment might apply to unlawful aliens. While no circuit has found Section 922(g)(5) unconstitutional, the Seventh, Ninth, and Tenth Circuits have either decided or assumed without deciding that aliens within the *Verdugo-Urquidez* definition are among "the people" the Second Amendment protects. *See, e.g.*, *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015) ("In the post-*Heller* world, where it is now clear that the Second Amendment right to bear arms is no second-class entitlement, we see no principled way to carve out the Second Amendment and say that the unauthorized (or maybe all noncitizens) are excluded."); *United States v. Torres*, 911 F.3d 1253, 1261 (9th Cir. 2019) (assuming without deciding that "unlawful aliens . . . fall with the scope of the Second Amendment" because the current "state of the law precludes [the court] from reaching a definite answer"); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1168 (10th Cir. 2012) (recognizing

that "the question seems large and complicated" and declining "to infer from *Heller* a rule that the right to bear arms is categorically inapplicable to non-citizens").[9] By contrast, the Fourth, Fifth, and Eighth Circuits have concluded the Second Amendment does not extend to unlawfully present noncitizens. *See United States v. Carpio Leon*, 701 F.3d 974, 989 (4th Cir. 2012) ("[I]llegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection."); *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) ("Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States."); *United States v. Flores*, 663 F.3d 1022, 1022–23 (8th Cir. 2011) ("[a]greeing with the Fifth Circuit that . . . the Second Amendment do[es] not extend to aliens illegally present in this country" with no further analysis).

It is possible that the *Heller* Court—by referencing "citizens" and using the term "political community," *Heller*, 554 U.S. at 580, instead of "national community" as in *Verdugo-Urquidez*, 494 U.S. at 265—was signaling that it now views the term "right of the people" differently depending on the Amendment in which that phrase appears. And perhaps it boils down to choosing which Supreme Court dicta to follow. Either the Supreme Court meant what it said in *Verdugo-Urquidez* when it defined "the people" as used in the Fourth and Second Amendments, or it meant what it said

---

[9]     The courts that have recognized that some aliens might fall within the definition of "the people" ultimately upheld Section 922(g)(5) as constitutional, but they did so by applying a means-end balancing test that was specifically rejected by the Supreme Court in *Bruen*. *See, e.g.*, *United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019); *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015); *United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012).

in *Heller* when it said Second Amendment rights belong to citizens or those within a political community.

Based on the analysis above, I find the more principled interpretation to be that "the people" as used in the Second Amendment includes unlawfully present aliens provided they meet the definition set forth in *Verdugo-Urquidez*—that is, if they are "part of a national community" or have "otherwise developed sufficient connection with this country to be considered part of that community." 494 U.S. at 265. Because I disagree with the Government's argument that Rebollar Osorio stumbles at the gate because of his unlawful status, I turn to whether Rebollar Osorio meets the *Verdugo-Urquidez* test.

### D.    Whether Rebollar Osorio Meets the *Verdugo-Urquidez* Test

Rebollar Osorio introduced evidence that in 2012, when he was sixteen years old, he was sent to the United States from Mexico after a Mexican drug cartel threatened to kill him if he did not join. He joined his two brothers, one of whom is a United States citizen, in this country and settled in Texas. According to his brother, Rebollar Osorio learned English and now speaks it very well. The record contains evidence that in the dozen years Rebollar Osorio has lived in this country in both Texas and Maine, he has spent considerable time working and caring for his family and others in his community, including helping friends, elderly neighbors, and even strangers in need. He is now married to a United States citizen. Before his arrest for allegedly violating Section 922(g)(5), he lived in Maine with his then-fiancée (now wife) and her mother. According to a criminal record check conducted by the U.S. Probation Office, he has never been arrested before. *See* Pretrial Services Report 2

14

(ECF No. 6). Rebollar Osorio has begun the paperwork to become a United States citizen. The Government offers no evidence to the contrary. Accordingly, I find that Rebollar Osorio has established a "sufficient connection with this country to be considered part of [the national] community" such that he is one of "the people" presumptively protected by the Second Amendment, and I proceed to the *Bruen* test.

## II.    *Bruen* Step One

*Bruen* requires me to first determine whether the plain text of the Second Amendment covers Rebollar Osorio's "conduct." *Bruen*, 597 U.S. at 17 ("[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."). Here, the relevant conduct is Rebollar Osorio's possession of a firearm, which is covered by the Second Amendment's right to "keep and bear arms."[10] *See United States v. Sing-Ledezma*, 706 F. Supp. 3d 650, 660 (W.D. Tex. 2023) ("[T]he regulated conduct is possession—not possession by an unlawfully present alien."). Because I find the Second Amendment covers Rebollar Osorio's conduct, I proceed to *Bruen* Step Two.

## III.    *Bruen* Step Two

At Step Two, the Government bears the burden to "justify its regulation" by showing the regulation is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. *Bruen* discusses two ways the Government can meet its burden. *Id.* at 26. First, the Government can show a "distinctly similar

---

[10]    During the founding period, the Second Amendment phrase " '[k]eep arms' was simply a common way of referring to possessing arms." *Heller*, 554 U.S. at 583.

historical regulation" that addresses "a general societal problem that has persisted since the 18th century." *Id*. If no such distinctly similar historical regulation exists or if "earlier generations addressed the societal problem . . . through materially different means," that suggests the challenged regulation conflicts with the Second Amendment. *Id*. at 26–27. Alternatively, the Government can meet its burden by reasoning by analogy, which may be necessary where the relevant societal concern did not exist at the founding or where "dramatic technological changes . . . require a more nuanced approach." *Id*. at 27. The Supreme Court recently reiterated this second *Bruen* step in *Rahimi*:

> As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances. Discerning and developing the law in this way is a commonplace task for any lawyer or judge.

> Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster." The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin."

*Rahimi*, 144 S. Ct. at 1898 (internal citations omitted).

Given the importance of comparing the purpose and means of the challenged legislation with those of its historical antecedents, I consider why Section 922(g)(5)

16

was enacted and how it works.[11] Section 922(g)(5) was enacted in 1986 to take firearms out of the hands of individuals "most likely to contribute to violent firearms crimes." 131 Cong. Rec. 24 (1985) (statement of Sen. McClure); *see also Sing-Ledezma*, 706 F. Supp. 3d at 661–62 (discussing the Firearm Owners' Protection Act of 1986 and its precursor, the Gun Control Act of 1968). In other words, presumably in an attempt to address violent crime and make the United States safer, Congress enacted Section 922(g)(5), which added aliens "illegally or unlawfully in the United States" to the categories of individuals prohibited from gun ownership.[12] *See* Firearm Owners' Protection Act of 1986, Pub. L. No. 99-308, § 102, 100 Stat. 449, 452 (1986). The statute works by creating criminal penalties for any unlawful alien who possesses or receives any firearm or ammunition.[13]

Under *Bruen*, the Government can satisfy the Step Two burden either by showing distinctly similar regulations or by showing historical restrictions that are

---

[11] Although "[w]hy and how" Section 922(g)(5) and any founding-era regulations burden the Second Amendment are "central" to the *Bruen* analysis, *Rahimi*, 144 S. Ct. at 1898, the Government's briefing does not address them.

[12] The Defendant introduced several articles that suggest undocumented immigrants have not in fact increased the rate of violent crime in this country. *See* Def.'s Suppl. Br. in Supp. of Def.'s Mot. to Dismiss, Exs. 3A–3D (ECF No. 33-2). But it is not for me to second-guess the wisdom of Congress's determination to bar unlawfully present aliens from possessing firearms. *See United States v. Kilmartin*, 944 F.3d 315, 341 (1st Cir. 2019) (stating that because "defining federal crimes and establishing appropriate penalties are matters within Congress's exclusive domain," courts "cannot sit as superlegislatures to second-guess congressional wisdom") (internal citations and quotation marks omitted).

[13] Some courts have noted that Section 922(g)(5) creates an "outright ban on all firearm possession." *Sing-Ledezma*, 706 F. Supp. 3d at 661. But the law applies only to firearms "possess[ed] in or affecting" interstate commerce or ones that have "been shipped or transported in" interstate commerce. 18 U.S.C. § 922(g). Further, the definition of "firearm" excludes any "antique firearm," 18 U.S.C. § 921(a)(3), which includes those "manufactured in or before 1898," certain replicas, and any "muzzle loading rifle," "shotgun," or "pistol" designed to use "black powder" or a "black powder substitute," *id.* § 921(a)(16).

analogous enough. I begin by considering whether the Government identifies any distinctly similar historical antecedents to Section 922(g)(5).

### A.   Whether There Are Distinctly Similar Regulations from Around the Founding Era that Address the Same Societal Problem that Section 922(g)(5) Seeks to Address

The Government claims that "[t]he historical record supports the conclusion that the Second Amendment was understood to extend the right to bear arms only to citizens—and, indeed, only to specific categories of citizens—at the time of its ratification." Gov't's Opp'n 9. In support of that statement, the Government points to the "English Bill of Rights" and colonial-era laws barring Native Americans, Catholics, and others who did not take an oath of allegiance from bearing arms. *Id.* at 9–11.[14] I now consider each of the early regulations put forward by the Government

---

[14]    At the hearing on the motion to dismiss, the Government offered argument but presented no evidence. I pointed out at the hearing that the Government's burden was evidentiary in nature, and I explained that citation of law review articles and contemporary cases would not meet the Government's *evidentiary* burden. The Government requested an opportunity to supplement the record, which I allowed. The Government later submitted a Supplemental Filing in Support of Its Opposition to Defendant's Motion to Dismiss (ECF No. 34) ("**Gov't's Suppl. Opp'n**"), to which it appended primary and secondary sources in full or excerpted form. It provided the following primary sources:

- Gov't's Suppl. Opp'n Ex. 1, 1 W. & M., Sess. 2, c. 2, 6 Statutes of the Realm 142–45 (ECF No. 34-1) ("**Gov't's Ex. 1**");
- Gov't's Suppl. Opp'n Ex. 3, The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins 263–308 (Neil H. Cogan ed., 2d ed. 2015) (ECF No. 34-3) ("**Gov't's Ex. 3**");
- Gov't's Suppl. Opp'n Ex. 4, *Bayard v. Singleton*, 1 N.C. 5 (1787) (ECF No. 34-4);
- Gov't's Suppl. Opp'n Ex. 5, *Dawson's Lessee v. Godfrey*, 8 U.S. (4 Cranch) 321, 2 L. Ed. 634 (1808) (ECF No. 34-5);
- Gov't's Suppl. Opp'n Ex. 8, 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 674–721 (ECF No. 34-8); and
- Gov't's Suppl. Opp'n Ex. 9, 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 758–61 (ECF No. 34-9).

It provided the following secondary sources:
- Gov't's Suppl. Opp'n Ex. 2, Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction vii–xv, 46–59, 328–34 (1998) (ECF No. 34-2) ("**Gov't's Ex. 2**");
- Gov't's Suppl. Opp'n Ex. 6, Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139 (2007) (ECF No. 34-6) ("**Gov't's Ex. 6**"); and

and assess how and why they were enacted and whether they are distinctly similar to Section 922(g)(5)'s firearms prohibition.

### 1.    English Declaration of Rights

The Government provides an excerpt of the English Declaration of Rights, which contains statutes from 1685 to 1694.[15] *See* Gov't's Suppl. Opp'n Ex. 1, 1 W. & M., Sess. 2, c. 2, 6 Statutes of the Realm 142–45 (ECF No. 34-1) ("**Gov't's Ex. 1**"). In a section titled "An Act declareing the Rights and Liberties of the Subject and Setleing the Succession of the Crowne," the Parliament authors describe how King James II, with the help of "diverse evill Councellors Judges and Ministers," tried to "subvert and extirpate the Protestant Religion," including by raising a standing army in peacetime and "causing several good Subjects being Protestants to be disarmed at the same time when Papists were both Armed and Imployed contrary to Law." Gov't's Ex. 1, at 5. In addition to denouncing King James II for his abuses of power and placing limits on royal authority,[16] the British Parliament declared that "Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." Gov't's Ex. 1, at 6.

The Government cites the English Declaration of Rights as evidence of a historical tradition of limiting gun ownership to "subjects," which the Government

---

- Gov't's Suppl. Opp'n Ex. 7, Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2024) (ECF No. 34-7).

[15]    The English Declaration of Rights was later codified as the English Bill of Rights. *Heller*, 554 U.S. at 593.

[16]    For example, Parliament declared that anyone who professes "the Popish Religion" or any king or queen who marries a Papist may not hold the throne in England. Gov't's Ex. 1, at 7.

equates with "citizens." Gov't's Opp'n 9–12. The Government makes the claim, unsupported by primary source material, that gun ownership at the time of the founding was limited to "citizens."[17] Gov't's Opp'n 9–12. As discussed above, the Government's assumption that the term "subject" is synonymous with the term "citizen" is doubly flawed. First, the term "citizen" is not used in the Second Amendment. Second, Blackstone himself referred to friendly aliens as "subjects." 1 Blackstone, Commentaries 354. Addressing this same argument in *Sing-Ledezma*, Judge Cardone wrote: "That the 'people' in the Founding era was likely understood to include 'aliens' as well as 'natural-born subjects' severely undermines the Government's argument that the English Bill of Rights' subjectship limitation should be read into the Second Amendment." 706 F. Supp. 3d at 664.

Additionally, the Supreme Court advised courts to "be careful" when comparing England and America on the issue of gun rights. *Bruen*, 597 U.S. at 35. One of the Government's own secondary sources makes the point that gun regulation in the colonies "departed from English precedent." *See* Gov't's Suppl. Opp'n Ex. 6, at

---

[17]     The only possible record source to support the Government's conflation of the terms "subject" and "citizen" comes from an assertion by Yale Professor Akhil Reed Amar in *The Bill of Rights: Creation and Reconstruction* that "the 'right to bear arms had long been viewed as a political right, a right of First-Class citizens." Gov't's Ex. 2, at 12. In a footnote, Professor Amar acknowledges "some fuzziness at the edges" of this statement and notes that "various militiamen who had borne arms for America were allowed to vote on the federal Constitution regardless of whether they met ordinary property qualifications" and that "years later, aliens who had already voted in various elections (as some states allowed) were subject to the military draft in the Civil War." Gov't's Ex. 2, at 12 (internal citations omitted). Professor Amar cites his own article to support these claims. *See* Gov't's Ex. 2, at 12 (citing Akhil Reed Amar, *The Central Meaning of Republican Government: Popular Sovereignty, Majority Rule, and the Denominator Problem*, 65 U. Colo. L. Rev. 749, 771–73 (1994)). The Government's own authorities show that the question of aliens' rights at the time of the founding was nuanced. But even if these secondary authorities were more helpful to the Government, they are a poor substitute for primary source material on a topic as complex as history and as controversial as gun rights.

4, Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139 (2007) (ECF No. 34-6) ("**Gov't's Ex. 6**"). That article describes gun practices in the American colonies as very different from those in England and criticizes scholars for

> underappreciat[ing] the distinctiveness of the universal militia as a colonial institution that had no corollary in the post-medieval British experience. That universal militia fostered in the American colonies an experience of keeping and bearing arms that was distinct from Great Britain in terms of practice, language, and law.

Gov't's Ex. 6, at 6.[18]

Moreover, the purpose of the English Declaration of Rights—to ensure that Protestants were never again disarmed—was different from the purpose of Section 922(g)(5). Protecting Protestants from subversive "Papists," *see, e.g.*, Gov't's Ex. 1, at 5, is a far cry from reducing violent crime. And the Government does not address the means by which the English Declaration of Rights, as compared to Section 922(g)(5), dealt with gun ownership. The English Declaration of Rights appears to sanction

---

[18]     Churchill goes on to explain that in England, Parliament: (1) "granted officers of the Crown the power to disarm any person they judged 'dangerous to the peace of the Kingdom' "; (2) "enacted permanent game laws restricting gun ownership on the basis of wealth"; and (3) "prohibited any Catholic subject from keeping arms unless they publicly renounced the doctrine of transubstantiation, thus disarming Catholics solely on the basis of faith." Gov't's Ex. 6, at 18–19. In contrast, in early America, there were neither "game laws limiting the right of gun ownership" nor any "blanket authority to disarm." Gov't's Ex. 6, at 19. Instead, early American laws restricted firearm possession based on race and servitude. Gov't's Ex. 6, at 19.

    The Government also submitted a chapter from *The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins*, which contains an excerpt of a legal dictionary from 1750. Gov't's Ex. 3, at 38. The excerpt appears to recount a British law from 1750 that limited household gun ownership to those who possessed "Lands to the Value of 100 *l*." Gov't's Ex. 3, at 38. The Government offers no argument as to how or why this passage represents a "distinctly similar" regulation to Section 922(g)(5)'s prohibition on gun possession by unlawful aliens. As the Government's secondary sources make clear, the colonies did not follow the English practice of limiting gun ownership to the landed gentry. Gov't's Ex. 6, at 10.

*arming* Protestants, *see, e.g.*, Gov't Ex. 1, at 6 (providing that "Protestants may have arms for their Defence"), but I do not see where it *disarms* any other group. By contrast, Section 922(g)(5) imposes an outright ban on possessing firearms and establishes criminal penalties—now up to a maximum fifteen-year prison term, *see* 18 U.S.C. § 924(e)(1)—if someone in the prohibited group violates the ban.

For these reasons, the English Declaration of Rights is not a "distinctly similar" regulation that addresses the same societal problem as Section 922(g)(5).

### 2. Early American Case Law

The Government also introduces two early American cases, *Bayard v. Singleton*, 1 N.C. 5 (1787), and *Dawson's Lessee v. Godfrey*, 8 U.S. (4 Cranch) 321, 2 L. Ed. 634 (1808). *See* Gov't Exs. 4 & 5 (ECF Nos. 34-4 & 34-5). The "aliens" at issue in those cases were British subjects who did not reside in the United States, and the courts held that they could not inherit or hold land in the United States. The Government does not explain how this common law is "distinctly similar" to Section 922(g)(5), and I find it is not.

### 3. Massachusetts' and Virginia's Statutory Bans on Arming Native Americans and Catholics

Next, the Government argues that colonial-era statutes did not extend the right to bear arms to those "not considered part of the political community/citizenry who swore allegiance to the United States." Gov't Opp'n 11. To support that argument, it asserts that Massachusetts and Virginia both prohibited the arming of Native Americans and that Virginia did not let Catholics own arms unless they swore

"allegiance to the Hanoverian dynasty[19] and to the Protestant succession." Gov't's Opp'n 11 (internal citation and quotation marks omitted). But the Government has not produced the colonial-era statutes that purportedly enacted these bans. Instead, to support its assertions, the Government cites a 1994 book by law professor Joyce Malcolm, and a 2007 article by history professor Robert Churchill. *See* Gov't's Opp'n 11 (citing Joyce L. Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140 (1994); Gov't's Ex. 6). Those citations do little to satisfy the Government's burden here. Because the Government has not presented any evidence that would allow me to conduct the how-and-why analysis of these colonial-era statutes, I consider the Government's arguments as to these statutes to be waived.

That said, it is worth noting that the Churchill article (the Government has not provided an excerpt of the Malcolm book) contains material that undercuts the Government's own position. For example, Churchill highlights "the absence from the colonial context of both game laws limiting the right of gun ownership and the blanket authority to disarm found in English statutes." Gov't's Ex. 6, at 19. Churchill further explains that "[w]hat took their place in British North America were laws disarming groups on the basis of race and servitude." Gov't's Ex. 6, at 19. As the Government

---

19   The Hanoverian dynasty was a chain of British monarchs that began with King George I in 1714 and included King George III, who reigned from 1760 to 1820 and was therefore king during the American Revolution and when the Constitution was adopted. *See The Hanoverians*, ROYAL.UK, https://www.royal.uk/hanoverians (last visited Sept. 26, 2024); *George III (r. 1760–1820)*, ROYAL.UK, https://www.royal.uk/george-iii (last visited Sept. 26, 2024). I fail to see how the Government's example of pledging allegiance to the Hanoverian dynasty—and the very king against whom this country's founders rebelled—supports the Government's argument that colonial-era statutes only permitted those "who swore allegiance to the United States" to bear arms. To me, this example suggests the opposite.

23

acknowledges, such classifications based on race or religion are "abhorrent" and " 'would be unconstitutional today.' " Gov't's Opp'n 15 (internal citation omitted). *See also United States v. Benito*, No. 3:24-CR-26-CWR-ASH, 2024 WL 3296944, at *4 (S.D. Miss. July 3, 2024) ("It is not clear why 21st century Americans should defer to many early Americans' racist beliefs about Native Americans or religious intolerance toward Catholics.").

Further, Churchill states that the 1756 Virginia order disarming those who refused to swear allegiance to the Hanoverian dynasty contained an exemption for "such necessary weapons as shall be allowed him by order of the justices of the peace . . . , for the defense of his house and person." Gov't's Ex. 6, at 20. And Churchill reports that anyone who voluntarily agreed to swear allegiance would have their arms returned, which means that even in Virginia, which was "the only colony disarming Catholics," any Catholics who were "willing to swear undivided allegiance to the sovereign enjoyed a right to keep arms denied them in England." Gov't's Ex. 6, at 20.

It is also worth noting that at the founding, Native Americans and those enslaved were oppressed people. As repugnant as these laws were, they were likely enacted to ensure that exploited groups did not revolt against the colonists who were forcibly taking their land or enslaving them. In comparing the "why" of these laws, I find that disarming an oppressed group perceived capable of—and motivated to—revolt is different from Section 922(g)(5)'s purpose of curtailing gun crime.

For these reasons, the laws enacted to disarm Native Americans, slaves, and Catholics are not distinctly similar to Section 922(g)(5).

### 4.    Oaths of Allegiance Requirements

The Government continues to press the allegiance aspect by citing a 2004 law review article on the "origins" of American gun regulation. *See* Gov't's Suppl. Opp'n Ex. 7, Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) (ECF No. 34-7) ("**Gov't's Ex. 7**"). The article states that "[d]uring the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons refusing to swear an oath of allegiance to the state or the United States." Gov't's Ex. 7, at 8. The article cites early laws in Maryland, Massachusetts, and Pennsylvania. Gov't's Ex. 7, at 8 n.128. These cited laws are not readily obtainable on Westlaw or Lexis and, although I left the record open, the Government has not provided copies of the relevant statutes for my review. Again, the Government carries the burden, and I lack the information I need to assess whether Section 922(g)(5) is distinctly similar to these early American laws.

### 5.    Ratification Debates

Finally, the Government introduces ratification debates in Massachusetts and New Hampshire concerning proposed amendments that would guarantee that "peaceable citizens" and those never "in Actual Rebellion" could keep their arms. Gov't's Opp'n 11 (internal citation and quotation marks omitted). The 1788 Massachusetts ratifying convention proposed adding the following provision to the Constitution: "And that the said Constitution be never construed to authorize

25

Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." Gov't's Suppl. Opp'n Ex. 8, at 8, Bernard Schwartz, *The Bill of Rights: A Documentary History* 674–721 (ECF No. 34-8). The 1788 New Hampshire ratifying convention recommended adding a provision that "Congress shall never disarm any Citizen unless such are or have been in Actual Rebellion." Gov't's Suppl. Opp'n Ex. 9, at 4, 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 758–61 (ECF No. 34-9).

If the point of the Government's citation to these documents is that the Massachusetts and New Hampshire ratifying conventions used the word "citizen" in their proposed amendments about the right to be armed, that argument misses the mark. Instead of adopting the word "citizen" as proposed by these two states, the drafters of the Second Amendment instead chose to bestow the right on "the people." *See Rahimi*, 144 S. Ct. at 1915 (Kavanaugh, J., concurring) ("[I]n using pre-ratification history, courts must exercise care to rely only on the history that the Constitution actually incorporated and not on the history that the Constitution left behind."); *see also Heller*, 554 U.S. at 603 (calling it "dubious" to rely on "proposals in the state conventions and the debates in Congress" to "interpret a text . . . widely understood to codify a pre-existing right, rather than to fashion a new one"). The ratification proposals presented by the Government thus fail to satisfy its burden.

### 6.    A Negative Inference

Before continuing with *Bruen* Step Two, I pause to point out another chink in the position taken by the Government. To explain why it has not identified founding-era gun restrictions concerning noncitizens that would be more similar to Section

922(g)(5) than its proffered regulations, the Government says that "illegal immigration is essentially a phenomenon that began in the late 19th century." Gov't's Opp'n 13. But founding-era laws indicate that the concept of aliens—friendly and otherwise—was well-understood in early America. *See, e.g.*, Naturalization Act, Pub. L. No. 1-3, § 1, 1 Stat. 103 (1790) (repealed 1795) (referring to "any alien");[20] Alien Act, Pub. L. No. 5-58, § 1, 1 Stat. 570 (1798) (expired 1800); Alien Enemies Act, 1 Stat. 577 (1798) (repealed 1881).

Returning to my Step Two analysis, I observe that at least one founding-era law—the Alien Act of 1798—arguably was animated by the same "general societal problem," *Bruen*, 597 U.S. at 26, as Section 922(g)(5). The Alien Act of 1798 empowered the President to remove aliens judged "dangerous to the peace and safety of the United States." Pub. L. No. 5-58, § 1, 1 Stat. 570 (1798) (expired 1800). Under the law, these "dangerous" aliens could be ordered "to depart," and criminal penalties would be imposed on aliens who remained "at large" after being ordered removed. *Id.*

The *Bruen* Court instructs that if "earlier generations addressed the societal problem through materially different means, then that suggests that the regulation at issue is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26–27. None

---

[20]    The Naturalization Act of 1790 outlined the procedure to become a citizen:

Any alien being a free white person, who shall have resided within the limits and under the jurisdiction of the United States for . . . two years, may be admitted to become a citizen thereof on application to any common law court of record in any one of the States wherein he shall have resided for . . . one year at least, and making proof . . . that he is a person of good character, and taking the oath or affirmation prescribed by law to support the Constitution of the United States, which . . . such court shall administer, and the clerk of such court shall record such application, and the proceedings thereon; and thereupon such person shall be considered as a citizen of the United States . . . .

Naturalization Act, Pub. L. No. 1-3, § 1, 1 Stat. 103 (1790) (repealed 1795).

of the early laws addressing aliens say anything about disarming the aliens. Though the Alien Act, like Section 922(g)(5), addressed concerns about aliens deemed dangerous to national peace and safety, it did not deal with that concern by restricting aliens' firearm possession.

The Government purports to support its claims with law review articles, but ultimately it offers no evidence of any founding-era laws that prohibited aliens as a class from possessing firearms or that disarmed aliens who were deemed dangerous. Accordingly, the Government has failed to identify a "distinctly similar historical regulation" sufficient to meet its burden at *Bruen* Step Two. *See Rahimi*, 144 S. Ct. at 1898 ("Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.").

## B. Whether Section 922(g)(5) As Applied to Rebollar Osorio Is Sufficiently Analogous to Founding-Era Laws

Having concluded Section 922(g)(5) "does not precisely match [the] historical precursors" the Government introduced, I now consider whether the Government instead satisfies *Bruen* Step Two by citing historical examples "analogous enough to pass constitutional muster." *Rahimi*, 144 S. Ct. at 1898 (internal citation and quotation marks omitted). I take care not to put too exacting a burden on the Government because its proffered precursor regulations "need not be a 'dead ringer' or a 'historical twin.'" *Id.* (internal citation omitted). But to be "analogous enough," the law must "comport with the principles underlying the Second Amendment." *Id.* (internal citation omitted). The Supreme Court instructs me to "apply[ ] faithfully the

28

balance struck by the founding generation to modern circumstances." *Id.* (internal citation and quotation marks omitted).

In my view, none of the laws the Government offers is sufficiently analogous to establish a comparable tradition of firearms regulation. The societal problem animating Section 922(g)(5) is the rise of violent gun crime. The law addresses that problem by taking firearms out of the hands of the people Congress deemed most dangerous. The Government has not argued that Section 922(g)(5) is analogous to the founding-era laws disarming dangerous people that have led courts to uphold other prohibited-person categories. *Cf. Rahimi*, 144 S. Ct. at 1901 (upholding 18 U.S.C. § 922(g)(8), which disarms anyone "found by a court to present a threat to others," because the law "fits neatly" within the tradition of "surety and going armed" laws). In any event, those early danger-based laws are different from Section 922(g)(5), which categorically disarms all unlawful aliens, dangerous or not. I have not seen a historical firearms restriction "analogous enough" to Section 922(g)(5) "to pass constitutional muster." *Rahimi*, 144 S. Ct. at 1898.

I emphasize that my decision is limited to the case before me. Rebollar Osorio has been in the United States since he was a minor. He has worked here, established a home, formed substantial connections to communities in Texas and Maine, and married a United States citizen. He has begun pursuing United States citizenship, and has never presented as a danger to himself or anyone else. He has sufficient connections with this country to be considered part of the "national community." *See Verdugo-Urquidez*, 494 U.S. at 265.

Under *Bruen*, the Government is required to prove that Section 922(g)(5), as applied to Rebollar Osorio, has distinctly similar or sufficiently analogous counterparts in founding-era firearms regulations. It has not met that burden. While I have taken an unguided plunge into the relevant history and sought to find what the Government failed to produce, I am not a historian and I do not bear a burden of proof. The little independent research I conducted suggests that aliens in the United States at the time of the founding were not disarmed as a class. And property-owning aliens may have been obligated to participate in the militia. 2 Kent, Commentaries 63–64 (2d ed. 1832) ("During the residence of aliens amongst us, they owe a local allegiance, and are equally bound with natives to obey all general law for the maintenance of peace, and the preservation of order . . . . They and their sons are liable to be enrolled in the militia of this state, provided they are seised of any real estate within this state.") (citing Militia Act, Laws of N.Y. sess 46. Ch. 244. Sec. 8.). I realize that a little bit of history can be a dangerous thing. After *Bruen*, the Government is in the unenviable position of proving historical truths, but here it has not provided enough history to meet its burden.

I thus join the district courts who have rejected these same "loose analogies" advanced by the Government and find that the Government "has not met its burden of proving a historical tradition sufficiently analogous to justify disarming all unlawfully present aliens" under Section 922(g)(5). *Sing-Ledezma*, 706 F. Supp. 3d at 672–73 (internal citations omitted); *see also Benito*, 2024 WL 3296944, at *7 ("Missing here is any evidence of history or tradition demonstrating that disarmament based

on immigration status is consistent with 'what was done at the founding.' ") (quoting *Rahimi*, 144 S. Ct. at 1898).[21] Accordingly, I conclude that Section 922(g)(5) is unconstitutional as applied to Rebollar Osorio.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendant's motion to dismiss (ECF No. 22).

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 11th day of October, 2024.

---

[21] I recognize that the one other judge within the First Circuit to consider Section 922(g)(5)'s constitutionality post-*Bruen* reached a different conclusion. As that court astutely noted, "*Bruen* all but invites judges to derive legally significant conclusions from an incomplete understanding of historical facts." *United States v. Pierret-Mercedes*, No. CR 22-430 (ADC), 2024 WL 1672034, at *25 (D.P.R. Apr. 18, 2024); *see also United States v. Yonatan Astacio-Mieses*, No. CR 23-028 (ADC), 2024 WL 4304630, at *5 (D.P.R. Sept. 26, 2024) (rejecting defendant's facial and as-applied challenge under Section 922(g)(5)(A) based on the same reasoning as *Pierret-Mercedes*). That I reached a different conclusion from the judge in those cases "illustrates the all-too-real concern that judges looking at the same history (or lack thereof) are now forced to make consequential pronouncements on historical 'truths' and derive their legal conclusions from them" and that "the chasm between these 'truths' can be vast." *Pierret-Mercedes*, 2024 WL 1672034, at *24. In this case, I let the parties' submissions guide me and it was the paucity of historical support that led to my conclusion.